1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8
9
10
11
12
13

| | |
|---|---|
| DAVID GOGGINS, GOGGINS BUILT NOT BORN LLC, and GOGGINS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM INC.; AMAZON.COM SERVICES, LLC,<br><br>Defendants. | CASE NO. 2:24-cv-00257<br><br>ORDER COMPELLING ARBITRATION AND STAYING CASE |

14

## 1. INTRODUCTION

15
16
17

This matter comes before the Court on Defendants Amazon.com, Inc. and Amazon.com Services, LLC's Second Motion to Compel Arbitration and to Stay Case Pending Arbitration. Dkt. No. 40.

18
19
20
21
22
23

Plaintiffs bring claims for trademark and copyright infringement, alleging Amazon has permitted counterfeit versions of Goggins's books to be sold on its marketplace. Amazon contends two agreements require arbitration of his claims: the Kindle Direct Publishing Agreement for digital books and the Amazon Advantage Agreement for hardcopy books. Plaintiffs argue, however, that most

1    parties never agreed to arbitrate with each other and that their counterfeit-related

2    claims fall outside any arbitration agreement.

3        Having reviewed the parties' briefing, the record, and applicable law, the

4    Court finds that valid arbitration agreements bind all parties and contain

5    enforceable delegation clauses. For the reasons explained below, the Court

6    GRANTS Defendants' motion to compel arbitration, Dkt. No. 40, and STAYS this

7    case in its entirety pending arbitration.

## 2.  BACKGROUND

### 2.1    The parties.

10       Plaintiff David Goggins is an athlete, military veteran, and author who has

11   written and self-published two books: *Can't Hurt Me* and *Never Finished*. Dkt. No.

12   33 ¶¶ 24, 32. Goggins is the sole member of both Plaintiff limited liability

13   companies: (1) Goggins Built Not Born, LLC ("GBNB"), a Delaware LLC that owns

14   the copyrights to Goggins's books, and (2) Goggins, LLC, a Delaware LLC that owns

15   various trademarks and common law rights associated with the Goggins brand and

16   products. *Id.* ¶¶ 12–13, 40–46; Dkt. No. 9.

17       Defendants Amazon.com, Inc. and Amazon.com Services, LLC operate online

18   platforms for book publishing and distribution. Dkt. No. 33 ¶¶ 14–15. Amazon.com

19   Services, LLC is a wholly owned subsidiary of Amazon.com, Inc. *Id.* ¶¶ 15, 344.

20   Since 2018, Goggins and his entities have used two Amazon programs to publish

21   and sell his books: Kindle Direct Publishing ("KDP") for digital books and Amazon

22   Advantage ("Advantage") for hardcopies. *Id.* ¶¶ 96–101; Dkt. No. 41 at 5 ¶ 3, 7 ¶ 9.

23

**2.2    The Publishing Agreements.**

### 2.2.1    The KDP agreements (digital books).

KDP is a program that allows authors, upon creating a KDP account, to self-publish and distribute their books through Amazon's online marketplace. Dkt. No. 41 at 5 ¶ 3.

In August 2018, Goggins created a KDP account to publish and distribute digital copies of his books. Dkt. Nos. 33 ¶ 101; 41 at 6 ¶ 5. In creating the account, he clicked an "Agree" button indicating assent to the KDP Terms and Conditions. Dkt. No. 41 at 5–6 ¶¶ 3–5. Amazon's internal records identify "David Goggins" as the account holder who accepted these terms. *Id*. at 6 ¶ 5. The Court refers to this agreement as the "Original KDP Agreement."

The Original KDP Agreement defined itself as a contract "between the individual or the entity identified in your Kindle Direct Publishing ('KDP') account ('you' or 'Publisher') and each Amazon party." *Id*. at 12, 28. It identified the "Amazon parties" as six specific entities (not including either Defendant) plus "each other Amazon affiliate that joins as a party to this Agreement," defining "affiliate" as "any entity that directly or indirectly controls, is controlled by, or is under common control with an Amazon party." *Id*.

The Original KDP Agreement contained two provisions critical to this motion. First, it included a mandatory arbitration clause:

> Any dispute or claim relating in any way to this Agreement or KDP will be resolved by binding arbitration, rather than in court…. The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes.

*Id.* at 21 ("10.1 Disputes"). Second, it reserved Amazon's right to modify the agreement:

> We reserve the right to change the terms of this Agreement at any time in our sole discretion. We will give you notice of the changes by posting new terms in place of the old at http://kdp.amazon.com/ ... with a revision date indicated at the top or by sending an email to the email address then registered for your Program account. . . . Changes... will be effective on the date we post them, unless we otherwise provide. . . . You are responsible for checking for updates and your continued use of the Program after we post changes will constitute your acceptance of the changes. If you do not agree to the changes, you must withdraw your Books from further distribution through the Program and terminate your use of the Program.

*Id.* at 13 ("2 Agreement Amendment"; "2.1 Changes to Agreement Terms . . . ").

In November 2023, Amazon updated the KDP Terms and Conditions and posted the amended version on kdp.amazon.com with a header reading "Last Updated: November 8, 2023." *Id.* at 6–7 ¶ 6. The Court refers to this updated version as the "Amended KDP Agreement." The Amended KDP Agreement expressly lists Defendant Amazon.com Services, LLC as one of the "Amazon parties," maintains the arbitration provision (now specifying AAA Commercial Arbitration Rules), and retains the affiliate provision. *Id.* at 28, 33.

Since the KDP program's inception, authors republishing their books must click a button marked "Publish Your Kindle eBook," above which appears bold text stating: "**By clicking Publish below, I confirm that I agree to and am in compliance with the KDP Terms and Conditions**." *Id.* at 7 ¶ 7. Between April 27, 2020, and March 28, 2024, Goggins clicked this button and republished his

books more than fifty times. *Id*. He has never discontinued his use of the KDP program. *Id*. ¶ 8.

### 2.2.2    The Advantage Agreement (hardcopy books).

Advantage is a retail consignment program that allows vendors to ship products to Amazon's fulfillment centers and have Amazon manage sales, delivery, customer service, and refunds. Dkt. No. 41 at 7 ¶ 9.

In September 2018, Goggins applied to join the Advantage program to sell physical copies of his books. *Id*. at 8 ¶ 10; Dkt. No. 47 at 2 ¶ 4. The enrollment process required him to: (1) enter contact information on the Advantage website; (2) receive and click a registration link via email; (3) review the Advantage Membership Agreement and Instructions and Rules; and (4) select "Accept all agreements." Dkt. No. 41 at 7 ¶ 9. Goggins completed these steps and later updated his account name to GBNB. *Id*. at 8 ¶ 10.

The Original Advantage Agreement (last updated October 2017) was between the enrolled "individual or entity" and "Amazon Fulfillment Services, Inc., and its affiliates." *Id*. at 37. Unlike the KDP Agreement, it contained no arbitration clause, instead providing that disputes "will be adjudicated in any state or federal court in King County, Washington." *Id*. at 40.

The Original Advantage Agreement authorized Amazon to "change any of the terms and conditions contained in this Agreement . . . at any time and in its sole discretion" by "posting a change notice or a new agreement on our website or in your

account page," with continued membership constituting acceptance. *Id*. at 39–40 (§ 17).

In November 2022, Amazon updated the Advantage Agreement. *Id*. at 9 ¶ 12. The Court refers to this as the Amended Advantage Agreement. The Amended Advantage Agreement listed Defendant Amazon.com Services, LLC as a party "and its affiliates," *id*. at 44, and added an arbitration provision:

> Any dispute or claim relating in any way to this Agreement or Advantage will be resolved by binding arbitration, rather than in court . . . The arbitration will be conducted by the American Arbitration Association (AAA) under its Commercial Arbitration Rules.

*Id*. at 48.

Amazon notified GBNB of this amendment by posting a "News" item at the top of GBNB's Advantage homepage for one month, from November 14 to December 14, 2022. *Id*. at 9 ¶ 13. The item, titled "Updating Advantage Membership agreement, instruction and rules," contained a "Read More" hyperlink leading to a bulletin stating: "we've changed the dispute resolution mechanism to arbitration" and "[y]our continued membership in Advantage after the posting of these changes constitutes your acceptance of the changes." *Id*. at 56. During this notice period, GBNB accessed its Advantage homepage 138 times. *Id*. at 10 ¶ 14. GBNB has never discontinued its Advantage membership. *Id*. ¶ 15.

## 2.3    Trademark and copyright licensing.

Both agreements grant Amazon broad licenses to intellectual property owned by Plaintiffs. The KDP Agreements license Amazon to "display and distribute . . . our trademarks and logos," Dkt. No. 41 at 18 (Original § 5.5(d)(i)), 31 (Amended §

5.5(e)), while the Advantage Agreements grant rights to "use, reproduce, perform, display, distribute and prepare derivative works" from all book-related materials including artwork and promotional content. *Id*. at 38 (Original § 11), 46 (Amended § 11). Both agreements required Goggins/GBNB to "represent and warrant" they had "full authority to grant" these licenses. *Id*. at 19, 32, 39, 46.

## 2.4    The present dispute.

In February 2024, Plaintiffs filed this lawsuit alleging Amazon has permitted and facilitated the sale of counterfeit "bootleg" versions of Goggins's books and products on its marketplace. Dkt. No. 33 ¶¶ 1–10. According to the First Amended Complaint, Amazon "commingles" legitimate Goggins products with inferior counterfeits—including "books with images askew" and books printed on "sub-par paper"—preventing customers from distinguishing authentic products from third-party knockoffs. *Id*. ¶¶ 117–125. Plaintiffs allege this has damaged Goggins's reputation and violated Amazon's public promises to prohibit counterfeit sales. *Id*. ¶¶ 126–138.

The operative complaint asserts claims for: copyright infringement (17 U.S.C. § 501); trademark infringement, false advertising, and false designation of origin under the Lanham Act (15 U.S.C. §§ 1114, 1125); violation of Washington's Personality Rights Act (RCW 63.60) and Consumer Protection Act (RCW 19.86); and common-law claims for trademark infringement, false advertising, and unjust enrichment. *Id*. ¶¶ 196–370.

1    Amazon now moves to compel arbitration, arguing all three Plaintiffs are

2    bound by the arbitration provisions in the agreements governing their business

3    relationship. Dkt. No. 40.

### 3. DISCUSSION

4    Amazon moves to compel arbitration based on two agreements: the KDP

5    Agreement governing digital book sales and the Advantage Agreement governing

6    physical book sales. Plaintiffs resist, arguing that most parties to this lawsuit never

7    agreed to arbitrate with each other.

8    The motion presents unusual complexity. Of the five parties to this litigation,

9    GBNB is the only one the parties do not dispute signed an agreement with Amazon.

10   The Court must thus determine whether: (1) the non-signatory Plaintiffs can be

11   bound to arbitrate; (2) the two Defendant entities can enforce agreements they may

12   not have originally signed; and (3) agreements governing legitimate book sales

13   encompass claims about counterfeit products.

14   This analysis proceeds in three parts. Section 3.2 examines whether each

15   Plaintiff is bound by an arbitration agreement, applying Washington contract

16   formation law and federal principles governing non-signatory liability. Section 3.3

17   addresses whether each Defendant has standing to enforce these agreements.

18   Section 3.4 considers whether the scope of these agreements encompass Plaintiffs'

19   claims—a question the Court ultimately finds is delegated to the arbitrator.

20   For the reasons explained below, the Court finds that all parties are bound by

21   enforceable arbitration agreements containing valid delegation clauses. The motion

22   to compel arbitration is therefore granted.

1

### 3.1    Legal standard.

2

The Federal Arbitration Act (FAA), 9 U.S.C. § 3 generally "requires district

3

courts to compel arbitration of claims covered by an enforceable arbitration

4

agreement." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir.

5

2022). When a party moves to compel arbitration, courts must determine two

6

gateway issues: "'(1) whether a valid agreement to arbitrate exists and, if it does, (2)

7

whether the agreement encompasses the dispute at issue.'" *Johnson v. Walmart,*

8

*Inc.*, 57 F.4th 677, 680 (9th Cir. 2023) (quoting *Chiron Corp. v. Ortho Diagnostic*

9

*Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).

10

The party seeking arbitration bears the burden of proving the agreement's

11

existence by a preponderance of the evidence. *Wilson v. Huuuge, Inc.*, 944 F.3d

12

1212, 1219 (9th Cir. 2019). Courts apply state-law principles of contract formation

13

to determine contract validity. *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1226–27

14

(9th Cir. 2022). While federal policy favors arbitration, this preference applies only

15

to ambiguities regarding an arbitration agreement's scope—not to questions of

16

whether an agreement exists. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S.

17

287, 301 (2010). Arbitration remains fundamentally "a matter of contract," and

18

parties cannot be compelled to arbitrate disputes they did not agree to submit to

19

arbitration. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

20

When parties clearly and unmistakably agree to delegate arbitrability

21

questions to an arbitrator through a delegation clause, courts must honor that

22

agreement. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019).

23

However, courts retain the threshold duty to determine whether a valid arbitration agreement was formed before any delegation can occur. *Id.*

An order compelling arbitration is "'in effect a summary disposition.'" *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n.9 (3d Cir. 1980), *abrogated on other grounds by Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 287–88 (3d Cir. 2017)). Thus, the determination of arbitrability is governed by the summary judgment standard of Rule 56. *Id.* If no genuine dispute of material fact exists regarding arbitrability, courts should compel arbitration. If factual disputes exist, courts must view evidence in the light most favorable to the non-moving party. *Id.*

## 3.2    Plaintiffs are bound by valid arbitration agreements.

Amazon bears the burden of proving by a preponderance of the evidence that valid arbitration agreements exist between these parties. *Henry Schein, Inc.*, 586 U.S. at 69 ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."). The Court must resolve this threshold question before any delegation to an arbitrator can occur. *Id.* Plaintiffs contest whether valid agreements exist, arguing: (1) David Goggins and Goggins, LLC never agreed to arbitrate; (2) Amazon.com, Inc. and Amazon Services lack standing to enforce the agreements; and (3) GBNB never received adequate notice of the arbitration amendments. Dkt. No. 46 at 7–22. These challenges go to contract formation—a gateway issue this Court must resolve.

### 3.2.1    David Goggins is individually bound.

The question here is whether David Goggins agreed to arbitrate in his individual capacity or solely as GBNB's agent. The Court finds that he is individually bound for three reasons.

First, Plaintiffs' own pleadings constitute a binding judicial admission. The First Amended Complaint states: "David Goggins entered into an agreement titled Kindle Direct Publishing Terms and Conditions [i.e., the Original KDP Agreement] . . . ." Dkt. No. 33 ¶ 101. "Factual assertions in pleadings . . . unless amended, are judicial admissions conclusively binding on the party who made them." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). Goggins attempts to walk back this admission through a declaration claiming he acted "on behalf of" GBNB. Dkt. No. 47 ¶ 3. But a party cannot create a genuine dispute of material fact by simply producing a declaration contradicting its earlier judicial admissions. *See Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").

Moreover, Plaintiffs amended their complaint *after* Amazon first moved to compel arbitration, making this admission with full knowledge of its significance. Having made a deliberate choice to allege that "David Goggins entered into" the agreement—not that he signed "as agent for GBNB"—Plaintiffs cannot now contradict this formal admission through self-serving testimony.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Second, Amazon's contemporaneous records identify "David Goggins"—not GBNB—as the account holder. Dkt. No. 41 at 6 ¶ 5. The Original KDP Agreement binds "the individual or the entity identified in your Kindle Direct Publishing ('KDP') account." *Id.* at 12. Under Washington law, unambiguous contract language controls over unexpressed subjective intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005) ("We do not interpret what was intended to be written but what was written.").

Third, Goggins's continued performance confirms individual assent. He personally clicked "Publish Your Kindle eBook" more than fifty times between 2020 and 2024, each time below bold text stating, "I confirm that I agree to and am in compliance with the KDP Terms." Dkt. No. 41 at 7 ¶ 7. The use of "I"—again, not "GBNB" or "we"—reinforces individual agreement. *See Berman*, 30 F.4th at 856 (clicking "I agree" establishes assent). Courts routinely find this type of clickwrap agreement, which "require[s] users to affirmatively assent to the terms of use before" accessing a website and using its services, *Wilson*, 944 F.3d at 1219 (applying Washington law), enforceable, *Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1189 (W.D. Wash. 2024); *see also Costless Wholesale, Inc. v. Amazon.com Services LLC*, Case No. SACV 23-01330-CJC, 2023 WL 6224825, at *2 (C.D. Cal. Sept. 20, 2023) (applying Washington law).

Having determined that Goggins is individually bound by the Original KDP Agreement and its arbitration clause, the Court need not decide whether he is also bound by the Advantage Agreement. The Court turns instead to GBNB, which

1   entered the Advantage Agreement but challenges the validity of the 2022

2   amendment purportedly adding the arbitration requirement.

### 3.2.2    GBNB is bound by the Advantage arbitration agreement.

4      The parties agree GBNB entered the Original Advantage Agreement in 2018.

5   The dispute centers on whether the 2022 amendment adding arbitration is

6   enforceable.

7      At the outset, the Court notes that the mere fact that the Original Advantage

8   Agreement expressly authorized Amazon to change "any of the terms and conditions

9   . . . at any time . . . in its sole discretion," *see id.* at 40, is not itself dispositive.

10  "Under Washington contract law, . . . unilateral modifications are only binding if

11  there is notice and assent to the changed terms." *Nicosia v. Amazon.com, Inc.*, 834

12  F.3d 220, 233 (2d Cir. 2016).

13     The Court also notes that Amazon does not offer evidence or argument that

14  GBNB received *actual* notice of the modification. But actual notice is not required.

15  Under Washington law, "[o]ne who has notice of facts sufficient to prompt a person

16  of average prudence to inquire is deemed to have notice of all facts which reasonable

17  inquiry would disclose." *Enter. Timber v. Wash. Title Ins. Co.*, 457 P.2d 600, 602

18  (Wash. 1969); *see also M.A. Mortenson Co. v. Timberline Software Corp.*, 998 P.2d

19  305, 313 (Wash. 2000) ("[I]t was not necessary for [plaintiff] to actually read the

20  agreement in order to be bound by it."). Thus, the narrow question for the Court is

21  whether GBNB received adequate *inquiry notice* of, and assented to, the

22  modification.

23

1

2

Plaintiffs argue that notice of the Amended Advantage Agreement was not adequate because Amazon "buried their notice relating to this amendment . . . amongst various other news articles and did not differentiate the notice from the other news articles or content on the website." Dkt. No. 46 at 27. Upon review of the record, the Court disagrees. Amazon provided notice of the Amended Advantage Agreement with the modified terms by way of a browsewrap agreement. Dkt. No. 41 at 9 ¶13. And though a court's evaluation of these agreements can be fact intensive, the Court concludes as a matter of law that "reasonable minds could not differ" about whether GBNB had notice of the amended agreement. *Reichert v. Rapid Invs., Inc.*, 56 F.4th at 1227 ("Mutual assent . . . may be determined as a matter of law 'if reasonable minds could not differ.'" (quoting *P.E. Sys., LLC v. CPI Corp.*, 289 P.3d 638, 643 (Wash. 2012)).

To start, Amazon notified GBNB of the modification in precisely the manner to which GBNB assented in the Original Advantage Agreement. That agreement stated that Amazon would notify GBNB of modifications by "posting a change notice or a new agreement on our website or in your account page"; that GBNB was "responsible for reviewing the new agreement"; and that GBNB's "CONTINUED MEMBERSHIP IN ADVANTAGE AFTER THE POSTING OF ANY CHANGES CONSTITUTE YOUR ACCEPTANCE OF SUCH CHANGES." Dkt. No. 41 at 40 (capitalization in original).

For a full month before the Amended Advantage Agreement went into effect, Amazon posted a "News" item—entitled "Updating Advantage Membership agreement, instruction and rules"—at the top of GBNB's Advantage account

ORDER COMPELLING ARBITRATION AND STAYING CASE - 14

webpage. *Id.* at 9 ¶ 13. This "News" item contained a "Read more" link, which, when clicked, led to a brief, easy-to-follow, one-page news bulletin with instructions on how to access the new agreement and explaining, in succinct language, that "we've changed the dispute resolution mechanism to arbitration" and that "continued membership in Advantage after the posting of these changes constitutes your acceptance of the changes." *Id.* at 56.[1] Throughout the month when this "News" link and news bulletin were posted, GBNB accessed its Advantage homepage 138 times. *Id.* at 10 ¶ 14. At no point then—or since—did GBNB discontinue membership in the Advantage program. *Id.* at 10 ¶ 15. The Court is satisfied that these undisputed facts demonstrate both reasonable notice and "conduct that a reasonable person would understand to constitute assent." *See Nicosia*, 834 F.3d at 233.

Plaintiffs' cited authorities do not counsel otherwise. *Lopez* and *Nguyen* are inapt because they address whether notice was adequate in the context of new users—not, as here, existing users who already agreed to the way in which notice of

---

[1] Plaintiffs argue that Amazon's failure to provide an image of the Advantage homepage creates doubt about the notice provided. Dkt. No. 46 at 10. But Amazon's uncontroverted declaration states that a "News" item titled "Updating Advantage Membership agreement" appeared "at the top" of GBNB's account homepage with a "Read More" hyperlink. Dkt. No. 41 at 9 ¶ 13. Plaintiffs offer no counter-declaration or evidence contradicting this placement—only speculation about what the homepage "likely" contained. Such conjecture cannot create a genuine dispute of material fact. *See McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016). The placement at the top of the homepage constitutes valid browsewrap notice under Washington law, which requires only that a hyperlink to terms be conspicuously placed. *Wilson*, 944 F.3d at 1220–21 (browsewrap agreements enforceable based on "conspicuousness and placement"); *Saeedy,* 757 F. Supp. 3d at 1189. That GBNB accessed this homepage 138 times during the notice period and had pre-agreed to receive modifications in this manner only strengthens the finding of adequate notice.

ORDER COMPELLING ARBITRATION AND STAYING CASE - 15

updates would be provided. *See Lopez v. Dave*, No. 22-CV-04160-VC, 2022 WL 17089824, at *1–2 (N.D. Cal. Nov. 21, 2022); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). *Coleman* does not apply because the contract there expressly required 30-day advance notice of any modification that would adversely affect members, which was simply not provided. *See Coleman v. Alaska USA Fed. Credit Union*, No. 3:19-CV-0229-HRH, 2020 WL 110742, at *5 (D. Alaska Jan. 9, 2020). *Jackson* is distinguishable because, there, "Amazon did not provide the court with a copy or description of any . . . notice" and did not "make any showing that [the plaintiff] received such notice." *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023). Here, by contrast, Amazon has provided the Court with a copy of the news bulletin that it issued on GBNB's account homepage to inform GBNB of the contract modification, thus meeting its evidentiary burden.

Finally, *Hunichen*, though more persuasive, is likewise distinguishable. *See Hunichen v. Atonomi LLC*, No. C19-0615-RAJ-MAT, 2019 WL 7758597 (W.D. Wash. Oct. 28, 2019), *report and recommendation adopted*, No. 219CV00615RAJMAT, 2020 WL 1929372 (W.D. Wash. Apr. 21, 2020). There, the plaintiff, a cryptocurrency buyer, signed a pre-sale agreement containing no arbitration clause, then, months later, just one day before the actual sale, received an email with an attachment that contained notice of the mandatory arbitration provision. *Id.* at *2. The court, finding the email-attachment notice insufficient, regarded it as decisive that the defendants, attempting to enforce the arbitration term, did not "identify a single affirmative act undertaken by plaintiff at any point after [the pre-sale]." *Id.* at *7. Here, by contrast, not only did GBNB receive a full month's notice (as opposed to

one day) before the contract modification went into effect—but GBNB, unlike the *Hunichen* plaintiff, took affirmative action after receiving the notice, accessing its Advantage account homepage 138 times during the notice period and continuing to actively perform under the Advantage program.

Having found adequate notice and assent, the Court concludes GBNB is bound by the Amended Advantage Agreement's arbitration provision. The Court now turns to whether non-signatory Goggins, LLC must also arbitrate despite never directly contracting with Amazon.

### 3.2.3    Goggins, LLC is bound to arbitrate under both the KDP and Advantage agreements.

Although Goggins, LLC did not sign either agreement, it is bound under agency law. Under Washington law, "'[a]rbitration agreements may encompass nonsignatories under contract and agency principles.'" *Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 833 (9th Cir. 2022) (alteration in original) (quoting *Romney v. Franciscan Med. Grp.*, 349 P.3d 32, 42 (Wash. Ct. App. 2015)). An undisclosed principal is bound by a contract made through an agent on its behalf. *Dana v. Boren*, 135 P.3d 963, 965 (Wash. Ct. App. 2006).

The undisputed facts compel only one conclusion: Goggins acted as agent for Goggins, LLC when entering these agreements. Both agreements grant Amazon rights to "display and distribute . . . your trademarks." Dkt. No. 41 at 18, 31 (KDP Agreements § 5.5(d)). Goggins, LLC owns these trademarks. Dkt. No. 33 ¶¶ 43–46. Goggins does not own them. *Id*. ¶¶ 12–13. Yet Goggins warranted he had "full authority to grant" these trademark licenses. Dkt. No. 41 at 19, 32, 39, 46 (§§ 5.8,

12). This warranty could only be truthful if Goggins possessed authority from Goggins, LLC to license its property. And as the sole member of both GBNB and Goggins, LLC, Goggins was authorized to act as an agent on their behalf. *See* Dkt. No. 9 (Corporate Disclosure Statement); *see also* 6 Del. C. § 18-402 (Delaware law); *accord* RCW 25.15.154(2)(a) (Washington law). No alternative explanation exists— either Goggins had authority from the trademark owner, or he fraudulently warranted authority he lacked. Plaintiffs do not suggest the latter, nor could they while simultaneously suing to protect those same trademarks.

Plaintiffs argue that common ownership between GBNB and Goggins, LLC "does not create an agency relationship between those entities." Dkt. No. 46 at 18. True, but this is irrelevant. The agency relationship here is not between the two LLCs but between Goggins (the individual agent) and Goggins, LLC (the principal whose property was licensed). That Goggins acted through GBNB when licensing Goggins, LLC's trademarks does not defeat agency—it confirms it. *See Univar USA, Inc. v. Haas TCM, Inc.*, 2009 WL 2406332, at *2 (W.D. Wash. Aug. 3, 2009) (CEO can bind nonsignatory corporation to arbitration agreement).

The Court need not address Plaintiffs' argument that Goggins, LLC cannot be bound as a third-party beneficiary. Dkt. No. 46 at 10–13. The third-party beneficiary doctrine governs standing to enforce contracts, not liability under them. *See* RESTATEMENT (SECOND) OF CONTRACTS § 304 (AM. L. INST. 1981). Agency principles, not beneficiary status, determine whether Goggins, LLC is bound.

1

2

Accordingly, Goggins, LLC is bound as an undisclosed principal whose agent necessarily acted on its behalf in licensing its intellectual property.

3

4

**3.3    Defendants can enforce the arbitration clauses in the KDP and Advantage Agreements.**

5

6

7

8

9

10

11

Plaintiffs argue that Defendants are not parties to the KDP and Advantage agreements and thus as non-parties, cannot enforce them. *See Britton v. Co-op Banking Grp.*, 4 F.3d 742, 744 (9th Cir. 1993) ("The right to compel arbitration stems from a contractual right. That contractual right may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration.") (citation modified). This argument fails for different reasons as to each Defendant.

12

13

14

15

16

17

18

19

Amazon Services' standing is straightforward. The Amended KDP Agreement expressly lists "Amazon.com Services, LLC" as one of the "Amazon parties." Dkt. No. 41 at 28. The Amended Advantage Agreement states that "'we,' 'our,' 'us,' and 'Amazon' mean Amazon.com Services, LLC, and its affiliates." *Id*. at 44. Plaintiffs' only response is that these amendments are invalid due to inadequate notice. But the Court has already rejected this argument. *See supra* § 3.2.2 (finding adequate notice and assent). As an express party to both amended agreements, Amazon Services has standing to enforce their arbitration provisions.

20

21

22

23

Amazon.com, Inc.'s standing is also straightforward, as it qualifies as an "affiliate" entitled to enforce the agreements. Both KDP and Advantage agreements define "Amazon" to include "affiliates." Dkt. No. 41 at 12, 28, 32, 44. The KDP Agreements define "affiliate" as "any entity that directly or indirectly controls, is

1   controlled by, or is under common control with an Amazon party." *Id*. at 12, 28.

2   Plaintiffs' complaint confirms this relationship: "Defendant Amazon.Com Services,

3   LLC is a wholly owned subsidiary of Defendant Amazon.Com, Inc." Dkt. No. 33 ¶

4   15; *see also id*. ¶ 344 (Amazon.com, Inc. is "parent company"). A parent company

5   "controls" its wholly owned subsidiary. Thus, the contract's plain language gives

6   Amazon.com, Inc. enforcement rights.

7         Plaintiffs cite *Britton* and *Zamora* in support of their position, but neither

8   case defeats Amazon's standing here. In *Britton v. Co-op Banking Grp.*, 4 F.3d 742

9   (9th Cir. 1993), the contract at issue made no mention of "affiliates" or any other

10  language that might refer to the nonsignatory defendant; the non-signatory

11  defendant was in no way a third-party beneficiary of the contract; and there was no

12  common ownership among the nonsignatory defendant and the signatory to the

13  agreement. The court found a complete absence of evidence suggesting the parties

14  intended the nonsignatory to enforce the agreement. *Id*. at 745.

15        In *Zamora v. BMW of N. Am.*, LLC, 2020 WL 5219565, at *2–4 (C.D. Cal.

16  July 8, 2020), the arbitration agreement did reference "affiliates," but it offered no

17  definition for the term—and more importantly, there was no common ownership

18  relationship between the signatory to the arbitration agreement (a private BMW

19  dealership) and the non-signatory defendant (BMW of North America).

20        In sum, the Court concludes that Defendants Amazon Services and

21  Amazon.com, Inc. both have contractual standing to enforce the arbitration clauses

22  in the Original and Amended KDP Agreement and the Amended Advantage

23  Agreement.

1

2

**3.4    The arbitration clauses in the KDP and Advantage Agreements require arbitration of Plaintiffs' claims.**

3

Having concluded that Plaintiffs are bound by, and Amazon is entitled to

4

enforce, the arbitration clauses at issue, the Court turns to the final substantive

5

question: do those clauses require arbitration of Plaintiffs' claims?

6

Plaintiffs contend their counterfeit-related claims are governed by Amazon's

7

general Conditions of Use—which provide for court resolution—rather than the

8

KDP and Advantage Agreements, which Plaintiffs characterize as "solely relat[ing]

9

to the sale of legitimate Goggins Books." Dkt. No. 46 at 11, 24–26. According to

10

Plaintiffs, agreements about authorized books cannot encompass disputes about

unauthorized counterfeits. *Id.*

11

This argument fails at the threshold. The arbitration provisions in both the

12

KDP and Advantage Agreements incorporate the AAA Rules, which explicitly

13

delegate scope determinations to the arbitrator. *See* Dkt. No. 41 at 21, 33, 48. The

14

AAA Rules provide that "[t]he arbitrator shall have the power to rule on his or her

15

own jurisdiction, including any objections with respect to the existence, scope, or

16

validity of the arbitration agreement." *Id.* at 74 (Consumer Rules R-14), 112

17

(Commercial Rules R-7).

18

The Ninth Circuit has repeatedly held that incorporation of AAA Rules

19

constitutes "clear and unmistakable" evidence that parties agreed to arbitrate

20

arbitrability—including scope questions. *Brennan v. Opus Bank*, 796 F.3d 1125,

21

1130 (9th Cir. 2015); *see also Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069,

22

1074 (9th Cir. 2013) ("Virtually every circuit to have considered the issue has

23

1    determined that incorporation of the [AAA] arbitration rules constitutes clear and

2    unmistakable evidence that the parties agreed to arbitrate arbitrability.").

3       Once parties delegate scope questions to an arbitrator, this Court lacks

4    jurisdiction to decide them—even if the Court believes the argument for arbitration

5    is "wholly groundless." *Henry Schein, Inc.*, 586 U.S. at 68–69. Whether Plaintiffs'

6    counterfeit claims "relate to" agreements about legitimate books is precisely the

7    type of scope question the parties delegated to the arbitrator.

8    **3.5    A stay pending arbitration is required.**

9       Once a court has determined that a lawsuit is arbitrable under the FAA, the

10    court "*shall* on application of one of the parties stay the trial of the action until such

11    arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C.

12    § 3 (emphasis added). As such, having determined that Plaintiffs' claims are subject

13    to mandatory arbitration, including on the issue of substantive arbitrability, this

14    Court is statutorily required to stay this action pending resolution of the parties'

15    arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26

16    (1983).

17                 **4.  CONCLUSION**

18       For the reasons explained above, the Court GRANTS Amazon's motion to

19    compel arbitration. Dkt. No. 40. Plaintiffs are ORDERED to arbitrate their claims

20    against Amazon. This action is STAYED as to all parties pending completion of the

21    arbitration. The Court DIRECTS the parties to file a joint status report every 120

22    days from the date of this Order, apprising the Court as to the status of the

23

ORDER COMPELLING ARBITRATION AND STAYING CASE - 22

arbitration. The Court DENIES AS MOOT Amazon's Motion to Stay Discovery, Dkt. No. 43, and DIRECTS the Clerk of Court to administratively TERMINATE Amazon's Motion to Dismiss. Dkt. No. 42.

The Court regrets its delay in ruling on this matter and recognizes the burden this has placed on the parties' ability to move forward with this case.

Dated this 30th day of September, 2025.

Jamal N. Whitehead
United States District Judge